COPIES MAILED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

1-15-15

REN YUAN DENG,

                         **Plaintiff,**

       -against-

NEW YORK STATE OFFICE OF MENTAL
HEALTH, et al.,

                         **Defendants.**

------------------------------------------------------------------- X

   :
   :
   :       13 Civ. 6801 (ALC)
   :
   :       <u>**MEMORANDUM AND**</u>
   :       <u>**OPINION**</u>
   :

**ANDREW L. CARTER, JR., District Judge:**

      Plaintiff Ren Yuan Deng ("Deng") brings this *pro se* action for monetary damages, as well as costs and reasonable attorney's fees, against defendants New York State Office of Mental Health ("OMH") and, in their individual capacities, Michael Hogan ("Hogan"), Molly Finnerty ("Finnerty"), Emily Leckman-Westin ("Leckman"), Lynn Heath ("Heath"), Barbara Forte ("Forte"), and Paul Connelly ("Connelly"). This is primarily a discrimination suit arising out of Deng's previous employment at OMH. Plaintiff's lengthy Amended Complaint sets forth a sundry list of claims, each falling under the umbrella of one of 11 self-styled themes that this Opinion substantially tracks for convenience. Deng alleges violations under 42 U.S.C. § 1983 ("Section 1983"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Humans Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), the Family and Medical Leave Act ("FMLA"), the New York Labor Law, and the Fair Labor Standards Act ("FLSA"). This Opinion resolves defendants' Motion to Dismiss.

      Deng pleads facts sufficient to state some claims for disparate treatment (which she categorizes as "Intentional Racial Discrimination") under the Equal Protection Clause and Title VII against Finnerty, Leckman, and Heath. In addition, some of her First Amendment retaliation

1

causes of action against Finnerty, Leckman, Heath, Forte, Connelly, and Hogan survive.  Further, Deng has met her burden with respect to making out a FMLA retaliation claim for wage deductions against Finnerty, Leckman, Forte, Connelly, and Heath.  Similarly, the plaintiff's New York Labor Law Section 193 claim for wage deductions against Finnerty, Leckman, Forte, Connelly, and Heath passes muster.  Deng's remaining claims are dismissed.  For the reasons set forth in greater detail below, the Motion to Dismiss is GRANTED in part and DENIED in part.

## BACKGROUND

The allegations in the Amended Complaint are assumed true only for purposes of the Motion to Dismiss.  Deng is a woman of Chinese ancestry who began her employment as a biostatistician in OMH in November 2001.  Am. Compl. ¶¶ 5-6.  She was assigned to the Bureau of Evidence-Based Services and Implementation Science ("EBSIS"), led by Director Finnerty.  *Id.* ¶ 10.  Deng's title was Research Scientist IV.  *Id.* ¶ 6.  From the beginning of her employment through her termination by arbitration on May 17, 2013, *id.* ¶ 154, Deng never received a promotion, *id.* ¶ 11.

2004-2009 Allegations

At least by the end of 2004, Deng began to experience discriminatory treatment due to her race.  The normal three-year probationary period for new hires was extended by six months for her on the concocted basis that her "performance was serious[ly] lacking."  *Id.* ¶ 13.  This occurred despite the fact that on October 5, 2004, she had received a Workforce Champion Award from the Governor's Office of Employee Relations for her work on a project creating a set of quality and safety pharmacy indicators.  *Id.* ¶ 9.  A white colleague of Deng's named Tom White received credit for her contributions on the team that won the award, and he was promoted from Research Scientist IV to Research Scientist V shortly afterward.  *Id.* ¶ 13.  But not before

being assigned to supervise Deng, with whom he shared the same rank. *Id.* In fact, in spite of Deng's excellent job performance, Finnerty marginalized her by placing Finnerty's name and the name of white employees on Deng's work and allowing the white employees to present the work instead of her. *Id.* ¶ 10.

Prior to Leckman's fateful arrival in 2006, there were approximately five Research Scientists in EBSIS. *Id.* ¶ 14. The other four employees were white. *Id.* Unlike her colleagues, Deng was never given leadership responsibility or the opportunity to publish. *Id.* Rather, Finnerty reserved desirable opportunities like publishing and attending conferences almost exclusively for white employees. *Id.* ¶ 15. In addition, Finnerty had a practice of promoting only white employees for reasons that were not job-related. *Id.*

In 2006, Deng was made to use her vacation or personal leave time with respect to the one-and-a-half days she worked from home due to illness. *Id.* ¶ 24. Finnerty told her that she would have to use her accrued time because of the OMH policy against working from home, even though Finnerty had not required white employees to do the same. *Id.* In mid-2007, Leckman, who is white and held the title of Research Scientist II at the time, was promoted over an Asian Research Scientist III named Shao, despite Leckman not having experience related to the job and Shao having a much longer tenure at OMH. *Id.* ¶ 26. Finnerty mentioned that communicating with Leckman was easier, although English as a first language was not a job-related skill. *Id.*

In September 2007, Finnerty assigned Deng to the PSYCKES Medicaid project, led by Leckman. *Id.* ¶ 35. Deng discovered that she was not being provided access to the project data that the team had been using, but rather had been working from a decoy folder created by Leckman for her. *Id.* Deng's access to the real project folder was blocked for approximately

eight months.  *Id.*  Finnerty did not take any remedial action upon being informed of Leckman's behavior.  *Id.*  After being removed from the PSYCKES Medicaid project, Deng was assigned to the FACT project.  *Id.* ¶ 36.  One year into her assignment, Finnerty appointed Leckman as a consultant to the team.  *Id.*  In that capacity, Leckman ordered Deng to rerun the yearlong statistical work that had been done for the purpose of allowing Leckman to receive credit for contributing to the group.  *Id.*  On one occasion, Leckman told Deng, "I don't like your method," but did not elaborate on how Deng could improve.  *Id.*

In early 2008, Deng learned that a Research Scientist V position was open.  *Id.* ¶ 27.  She approached Finnerty and requested a promotion.  *Id.*  Finnerty turned her face to the side, making it apparent that Deng would not receive her support.  *Id.*  Finnerty's support was essential for a promotion.  *Id.*  In March 2009, Leckman was elevated to Research Scientist V, the most senior position in EBSIS.  *Id.* ¶ 29.  She ascended to the job prior to the end of her three-year probationary period, and in spite of the fact that she had been on maternity leave twice in three years.  *Id.*  Deng was more qualified than Leckman for the position.  *Id.* ¶ 31.

<u>2010-2013 Allegations</u>

In June 2010, Finnerty informed Deng that if she wanted to work on the highly coveted Pool State Data project, she must accept Leckman as her supervisor.  *Id.* ¶ 39.  Deng explained that she had had a very negative experience working with Leckman.  *Id.*  Finnerty indicated that Deng could not refuse a supervisor and added that Deng would be subject to disciplinary action if she attended any project meetings without first submitting to Leckman.  *Id.*  Finnerty's intensive emails regarding this matter caused Deng emotional distress.  *Id.*

On July 28, 2010, Deng complained to Assistant Director of Personnel Connelly and an individual named Prochera of being discriminated against for being Chinese American.  *Id.* ¶ 42.

She requested a transfer. *Id.* The following day, Finnerty blocked Deng's access to the OMH

email system and servers. *Id.* Her email access was restored on August 5, 2010. *Id.* Her server

access was restored on November 19, 2010. *Id.* In the interim, she lost access "to OMH major

Oracle databases, most system shared drives, Novell, and Deng's own personal folders. Deng's

own personal folders contain the files that were used in connection with Deng's on-going work

at OMH." *Id.* ¶ 56.

On September 24, 2010, Deng accepted Leckman as her supervisor. *Id.* ¶ 48. In October

2010, Deng received a Notice of Discipline ("NOD") suggesting a four-week suspension without

pay for misconduct, including repeated insubordination towards Finnerty, failure to report to

Leckman, and failure to follow HR Director Heath's order to meet with Leckman immediately.

*Id.* ¶ 50. Deng denied all wrongdoing. *Id.* On October 25, 2010, Leckman informed Deng that

she was being removed from the Pool State Data project, which caused Deng to cry. *Id.* ¶ 51.

On November 11, 2010, Deng filed a charge of discrimination with the Equal Employment

Opportunity Commission. *Id.* ¶ 53.

Since Deng filed her EEOC charge, she was "subjected to ... adverse employment

actions in retaliation." *Id.* ¶ 54. Deng was added to the "Medication Adherence" project in

November 2010 after the filing. *Id.* ¶ 59. Leckman repeatedly ridiculed Deng's performance

while simultaneously declining to provide "any explanation or meaningful input on how to

improve the product" and preventing Deng from presenting her work to an expert panel for

constructive feedback. *Id.* She even cancelled a meeting with the panel on the false basis that

Deng's work was not ready to be presented. *Id.* Leckman's stated expectation of one to two

deliverables each week was objectively unreasonable in light of the demanding nature of the

project. *Id.* Leckman further alienated Deng by prohibiting her membership in the group email listserv for the first four months of her assignment. *Id.*

Deng was also excluded from EBSIS staff meetings shortly after her complaint to the EEOC, which meant that "she was not privy to any information required to do her job." *Id.* ¶ 55. And she appears to have been again denied access to OMH servers, such that she emailed Leckman and the IT manager, Phi, requesting the restoration of her access on January 11, 2011. *Id.* ¶ 56.

On April 28, 2011, Deng was relocated from a quiet office to a loud workstation. *Id.* ¶ 58. During the summer months, in part due to OMH's failure to repair a broken air conditioner, "the excessive heat and poor ventilation made it difficult to breathe." *Id.* Meanwhile, there were three vacant offices with functioning air conditioners. *Id.* Also, the door by Deng's workstation slammed each time it was opened and closed, breaking her concentration. *Id.* On July 7, 2011, Deng complained to the OMH Diversity Management Division, but there was no reply. *Id.*

On December 18, 2011, Deng broke her kneecap in an accident. *Id.* ¶ 84. On or around that date, she attempted to take FMLA leave. *See id.* ¶ 85. She returned to work on March 23, 2012. *Id.* ¶ 88. OMH refused to pay Deng for the sick leave she took, deeming it "unauthorized leave without pay." *Id.* ¶ 90. Deng became sick due to this determination. *Id.* On April 5, 2012, Finnerty informed Deng of a new Bureau attendance policy requiring Deng to obtain Leckman's approval prior to taking sick leave. *Id.* ¶ 93. This policy was designed to retaliate against Deng for taking sick leave and to force her to accept Leckman's supervision. *Id.* The new policy allowed OMH to deduct wages from Deng's paycheck, beginning with an ostensibly unauthorized doctor's appointment on June 1, 2012, for which Deng had attempted to use her paid sick leave. *Id.* ¶ 107.

Between the filing of Deng's EEOC charge and her suspension without pay on October 4, 2013, *id.* ¶¶ 147, 152, she received several notices of interrogation (one of which caused her to collapse), *id.* ¶¶ 45, 66; was subjected to multiple interrogations and counseling sessions, *id.* ¶¶ 64, 69, 79, 96, 145; and had three NODs and a counseling memorandum placed in her file, which were cited in the arbitration ending in her termination, *id.* ¶ 149.   Finnerty and Leckman also made surprise visits from Albany to chastise and generally supervise her.  *Id.* ¶¶ 64-65, 71, 78. In addition, Leckman frequently emailed and called Leckman with orders, which caused Deng distress.  *See, e.g.,* ¶¶ 39, 63, 79.

Deng's arbitration on May 17, 2013 resulted in a finding that there had not been probable cause to suspend her without pay on October 3, 2012.  *Id.* ¶ 155.  OMH was ordered to compensate Deng for her lost salary and benefits.  However, the arbitration also resulted in a finding that there was just cause to terminate Deng, which OMH did.  *Id.*

Throughout this timeframe, Deng made periodic complaints to Commissioner Hogan. Beginning on April 21, 2011, Deng complained a total of five times, to no avail.  Deng requested that he prevent her relocation to Finnerty's office because Finnerty played a role in the discriminatory acts that were the subject of Deng's then-recently filed complaint with the Equal Employment Opportunity Commission ("EEOC").  *Id.* ¶ 57.  Hogan replied: "It is not wise or practical for me to intervene in employee complaints, particularly where formal grievance processes have already been invoked…"  *Id.*  On one of the four remaining occasions, Deng sent Hogan some work product and requested a small grant.  *Id.* ¶ 67.  In two other communications—emails sent two hours apart—Deng described being harassed in retaliation for complaining about the discrimination she faced.  *Id.* ¶¶ 79-80.  Heath replied to Deng's emails. *Id.* ¶ 81.  Likewise, Heath replied to an email Deng sent the Commissioner requesting a transfer

so that she would no longer be under the supervision of Finnerty and Leckman. *Id.* ¶¶ 95, 98.

Notwithstanding his silence, Hogan had actual knowledge of a "[m]istreatment plan" devised by

Finnerty, Leckman, Heath, Forte, and Connelly in retaliation for Deng's complaints of

discrimination, and through his indifference, tacitly authorized and condoned their behavior. *Id.*

¶ 63.

## STANDARD OF REVIEW

To survive a motion to dismiss, a pleading must contain "a short and plain statement of

the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The pleading

"need not include detailed factual allegations, but must contain sufficient factual matter ... to

state a claim to relief that is plausible on its face." *Corona Realty Holding, LLC v. Town of N.*

*Hempstead*, 382 F. App'x 70, 71 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009)) (internal quotations omitted). Recital of the elements of a cause of action, "supported by

mere conclusory statements," is insufficient to show plausibility. *Id.* at 72. And yet "[a]

document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully

pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted) (internal quotations omitted).

Indeed, "the pleadings of a *pro se* plaintiff ... should be interpreted to raise the strongest

arguments that they suggest." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (internal

quotations omitted).

## DISCUSSION

I.      *Section 1983 Claims against OMH*

Deng's Section 1983 claims against OMH, a state agency, are dismissed for lack of subject matter jurisdiction. *See Gross v. New York*, 428 F. App'x 52, 53 (2d Cir. 2011) ("The Eleventh Amendment bars § 1983 claims against states, absent their consent…. New York has waived its immunity from liability and consented to be sued only to the extent that claims are brought in the New York Court of Claims, as opposed to federal court ….") (citation omitted).

## II.     *New York State and New York City Human Rights Law Claims*

Deng's NYSHRL and NYCHRL claims against OMH also fail. *Rumain v. Baruch Coll. of the City Univ. of N.Y.*, No. 06 Civ. 8256, 2007 U.S. Dist. LEXIS 36964, at *6 (S.D.N.Y. May 17, 2007) ("Plaintiff's proposed claims under the State and City human rights laws are barred by the Eleventh Amendment since New York has not waived its immunity from suit in federal court under those laws.") (citing *Richardson v. N.Y. State Dep't of Corr. Servs.*, 180 F.3d 426, 432, 447-49 (2d Cir. 1999)). Presented with this argument by defendants, Deng abandons her claims against OMH and attempts instead to pin aider and abettor liability onto the individual defendants under NYSHRL § 296(6). Opp'n 24-25. That provision states: "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. Exec. Law § 296(6) (McKinney). Aside from being barred for failure of the plaintiff to raise the claim in the Amended Complaint,[1] Deng's theory is unavailing because a predicate for aider and abettor liability under this provision is employer liability. *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999).

## III.     *Title VII Claims Against the Individual Defendants*

---

[1] *See, e.g., Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F. Supp. 518, 526 (S.D.N.Y. 1977) ("[A] party is not entitled to amend his pleading through statements in his brief.").

Deng's claims under Title VII against the individual defendants are dismissed. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir. 1995) ("the statutory scheme and remedial provisions of Title VII indicate that Congress intended to limit liability to employer-entities").[2]

## IV.    *Personal Involvement of Hogan*

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Shomo v. City of N.Y.*, 579 F.3d 176, 184 (2d Cir. 2009). In this context, the common law doctrine of *respondeat superior* does not apply; that would be too easy. Instead, a defendant's actions must be the proximate cause of the injury described. *Walker v. Clemson*, No. 11 Civ. 9623, 2012 WL 2335865, at *7 (S.D.N.Y. June 20, 2012), *adopted*, 2012 WL 3714449 (S.D.N.Y. Aug. 28, 2012). Defendants posit that Hogan, who was OMH Commissioner at the time of the relevant events, lacks the requisite personal involvement in the harm Deng alleges was inflicted upon her. Mot. Dismiss 25-26.

The Second Circuit has stated the rules for establishing a supervisor's personal involvement in a Section 1983 action:

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong,[3] (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring.

---

[2] Moreover, in her Opposition, Deng disavows any attempt to impose such liability. Opp'n 12.

[3] This second example is construed more narrowly than it reads. As Magistrate Judge Gorenstein notes in *Johnson v. Wright*, merely sending a letter to a supervisor does not create personal involvement. 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002). Moreover, the second example in *Coughlin* is taken from *United States ex rel. Larkins v. Oswald*, 510 F.2d 583, 589 (2d Cir. 1975), in which a supervisor was required by regulation to receive reports of prison conditions. *Wright*, 234 F. Supp. 2d at 363.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Deng asserts that Hogan became personally involved in the constitutional torts she suffered by exhibiting "reckless indifference" towards her conditions. Am. Compl. ¶¶ 4, 81.

Defendants argue, correctly, that personal involvement on the part of Hogan does not arise from Deng's communications with the Commissioner. Mot. Dismiss 25-26. "Both the Court of Appeals and numerous district courts in this Circuit have held that receipt of letters or grievances is insufficient to impute personal involvement." *Gonzalez v. Sarreck*, No. 08 Civ. 3661, 2011 WL 5051341, at *14 (S.D.N.Y. Oct. 24, 2011). Of the five communications Deng alleges to have made to Hogan, she states that he only replied to the first. Specifically, the plaintiff claims to have requested of Hogan that he prevent her relocation to Finnerty's office because Finnerty played a role in the discriminatory acts that were the subject of Deng's then-recently filed complaint with the Equal Employment Opportunity Commission ("EEOC"). Hogan is said to have replied: "It is not wise or practical for me to intervene in employee complaints, particularly where formal grievance processes have already been invoked…" Although the mere receipt of Deng's complaint by a supervisor in Hogan's position cannot establish personal involvement, some responses by Hogan might have. *See, e.g.*, *Ramos v. Artuz*, No. 00 Civ. 0149, 2001 WL 840131, at *8 (S.D.N.Y. July 25, 2001) (official "sent plaintiff numerous letters containing some explanation or justification concerning the issues raised by plaintiff in his letters"); *Johnson v. Bendheim*, No. 00 Civ. 720, 2001 WL 799569, at *6 (S.D.N.Y. July 13, 2001) (official denied prisoners' grievances after receiving them); *James v. Artuz*, 93 Civ. 2056, 1994 U.S. Dist. LEXIS 5708, at *26 (S.D.N.Y. May 2, 1994) (official conducted *de novo* review of prisoner's disciplinary hearing).

Hogan's reaction is not on the level of these examples.  The plaintiff has not pled facts suggesting that her communication provided actual or constructive knowledge of specific constitutional torts under Section 1983.  *See McCann v. Coughlin*, 698 F.2d 112, 125 (2d Cir. 1983) (finding personal involvement when prison officials had actual or constructive notice of their internal disciplinary procedures, which clearly violated the procedural Due Process rights of inmates).  Accordingly, the express reliance of this supervisor—multiple levels removed from the plaintiff in the chain of command—on a formal investigative process that the plaintiff herself invoked cannot create liability.

The other communications mentioned in the Amended Complaint also fail to establish personal involvement.  On one of the four remaining occasions, Deng states that she sent Hogan some work product and requested a small grant.  There is no indication that the Commissioner even received her communication, let alone replied to it.  *See id.*  Deng avers that in two other communications—emails sent two hours apart—she described being harassed in retaliation for complaining about the discrimination she faced.  The Amended Complaint states that Heath, rather than Hogan, replied to Deng's emails.  Likewise, Heath, in lieu of Hogan, replied to an email the plaintiff sent the Commissioner requesting a transfer so that she would no longer be under the supervision of Finnerty and Leckman.  As to the communications to which Heath replied on behalf of Hogan, a supervisor's mere referral of a letter complaint to another official does not attach liability to the referring supervisor.  *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997).

Nevertheless, elsewhere in the Amended Complaint, Deng alleges enough facts to satisfy the personal involvement element as to claims involving retaliation.  Although worded inartfully, the plaintiff alleges that Hogan's "actual knowledge" of, yet conscious decision to not protect her

from, the retaliatory "[m]istreatment plan" of his subordinates amounted to "reckless

indifference." Deng's allegation of deliberate indifference, which proximately caused her harm,

"is sufficient to give [Hogan] notice of the particular claim being made and thus must be

accepted by the Court for purposes of a motion to dismiss." *Johnson v.* 234 F. Supp. 2d 352, 364

(S.D.N.Y. 2002).

## V.   *Intentional Racial Discrimination*

Under this theme, Deng invokes Section 1983 (grounded in the Equal Protection Clause

of the 14th Amendment[4]) and Title VII,[5] respectively.  Her claims are directed at Finnerty,

Leckman, Heath for her role in authorizing and ratifying their conduct, and OMH.  While there

are some differences between Section 1983 and Title VII, such as the types of defendants that

may be found liable, "[m]ost of the core substantive standards that apply to claims of

discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in

employment in violation of … the Equal Protection Clause." *Patterson v. Cnty. of Oneida*, 375

F.3d 206, 225 (2d Cir. 2004).  *See also Jemmott v. Coughlin*, 85 F.3d 61, 67 (2d Cir. 1996)

("Title VII law … is utilized by courts considering § 1983 Equal Protection claims").

To prevail in a claim of disparate treatment, which is what Deng's allegations, construed

coherently, posit here, Deng must eventually "establish a *prima facie* case by demonstrating that:

(1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she

suffered adverse employment action; and (4) the action occurred under conditions giving rise to

---

[4] The Equal Protection Clause of the 14th Amendment provides: "No State shall … deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.
[5] Title VII provides, in relevant part: "It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a) (West).

an inference of discrimination." *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (citing *McDonnell Douglas*, 411 U.S. 792, 802 (1973)). However, this is an evidentiary standard. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002). At the pleading stage, a plaintiff merely needs to allege facts sufficient "to state a claim for relief that is plausible on its face." *Corona Realty Holding, LLC*, 382 F. App'x at 71.

Deng, a woman of Chinese descent, *see Hengjun Chao v. Mount Sinai Hosp.*, 476 F. App'x 892, 896 (2d Cir. 2012) (Asian a protected class), claiming to have excelled at her job, cites to various indicia of racial animus. The Court need not consider all of the indicia to conclude that, taken together, Deng's factual allegations could give rise to an inference of discrimination. She states that Finnerty, as Director of EBSIS, had a "pattern [or] practice of segregating staff by race," and that "the director, project manager, or team leader positions … are *exclusively* for Caucasian staff," a phenomenon that is not job-related. Am. Compl. ¶ 4. Deng notes that despite being part of a project team that in 2004 received a Workforce Champion Award from the State of New York for her performance, the normal three-year probationary period for new hires was extended by six months in her case under the false pretense that there were concerns her performance was seriously deficient. Meanwhile, a white colleague of the same rank named Tom White received credit for Deng's work on the award-winning project team and was promoted shortly thereafter, whereas Deng never received a promotion from her initial rank of Research Assistant IV in the 12 years she worked at OMH.

Deng alleges that prior to Leckman's arrival in 2006, there were approximately five Research Assistants in EBSIS, of whom the remaining four were white, and that unlike her colleagues, Deng was never given leadership responsibility or credit in a publication. Indeed, Finnerty reserved nearly all opportunities to publish, attend conferences, and partake in other

desirable activities for herself and her white subordinates.  Deng further avers discriminatory enforcement of OMH's policy against employees working from home, noting that in November 2006 she was made to use her vacation or personal leave time to cover the days on which she worked out of the office, whereas white employees had not been required to do the same. According to Deng, when a Research Scientist IV position became available in mid-2007, Leckman, who is white and held the title of Research Scientist II, was promoted over an Asian Research Scientist III named Shao, despite the fact that Leckman had no job-related experience and Shao had worked at OMH for many more years.  Apparently by way of explanation, Finnerty indicated that Leckman was easier to communicate with, even though English as a first language was not a job-related skill.  In March 2009, Leckman was promoted again to Research Scientist V, the most senior position in EBSIS, despite the fact that her three-year probationary period had not ended, she had been on maternity leave twice in three years, and she had started at OMH as a Research Scientist II.  By contrast, in early 2008, Finnerty had made it apparent through her body language that she would not support Deng, who was more qualified than Leckman for the position.

Additionally, Leckman is described as having engaged in racially discriminatory treatment through taking credit for the work done by minority employees and erecting barriers to their successful job performance.  *Id.* ¶ 4.  Heath, in her capacity as a Personnel officer, is said to have had a "pattern [or] practice that authorized or ratified the racial harassment" practiced by the other defendants.  *Id.*

Although most of Deng's allegations of mistreatment are not severe enough to be actionable under either statute, for the following reasons, the Court finds that the plaintiff has articulated a few claims under Section 1983 and Title VII.

### A.    Equal Protection Clause

When a 1983 suit is against defendants in their individual capacities, aside from personal involvement, a plaintiff must show that the discrimination was intentional. *Patterson*, 375 F.3d at 226. Here, the plaintiff has met her burden. *See Perry v. State of N.Y. Dep't of Labor*, No. 08 Civ. 4610, 2009 WL 2575713, at *2 (S.D.N.Y. Aug. 20, 2009) ("Allegations supporting motive may include preferential treatment given to similarly situated individuals or remarks that convey discriminatory animus.").

Moreover, state law supplies the statute of limitations for Section 1983 claims, and in New York State that period is three years. *Harrison v. Harlem Hosp.*, 364 Fed. App'x 686, 688 (2d Cir. 2010). Deng's original Complaint was filed on September 24, 2013, which means she can assert disparate treatment claims only for those adverse employment actions taken within the preceding three-year period.[6]

Most of the injuries Deng complains of are insufficiently adverse to rise to the level of constitutional torts. "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the *terms and conditions of employment*.... An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (internal quotations omitted) (emphasis added). For example, Deng directs the Court's attention to such inconveniences as her participation in the highly coveted Pool State Data project being conditioned on her acceptance of her duly appointed supervisor, Leckman; notices of interrogation; actual interrogations; counseling sessions; surprise visits from her superiors; being

---

[6] The Amended Complaint was filed on January 7, 2014. In their Motion to Dismiss, the defendants do not contest the relation-back of the Amended Complaint to the Complaint for purposes of New York's statute of limitations, and the Court finds that such relation-back is proper. *See* Fed. R. Civ. P. 15(c)(1)(B) ("An amendment to a pleading relates back to the date of the original pleading when: the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.").

blocked from accessing her OMH email for eight days; and frequent emails and calls from Leckman with orders.

The aforementioned injuries have either been rejected in this Circuit or are on the level of those that have been rejected. *See, e.g., Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) ("even assuming the counseling rose to the level of some form of criticism, we have held … that criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action") (internal quotations omitted); *Costello v. N.Y. State Nurses Ass'n*, 783 F.Supp.2d 656, 677 (S.D.N.Y. 2011) (no adversity where plaintiff was "inundate[d] … with emails and questions regarding her work performance").

Deng further alleges that after being relocated to a different office space on April 28, 2011, during the summer months "the excessive heat and poor ventilation made it difficult to breathe." This was in part due to OMH's failure to repair a broken air conditioner. Deng states that she complained to OMH about these conditions on July 7, 2011 but received no response. To impose liability, Deng would need to show that she made more of an effort to get OMH to improve these conditions. Instead, Deng indicates that she only complained once, and does not allege that her complaint was ever received.

Nevertheless, Deng articulates adverse employment actions that 1) fall within the three-year period[7] and 2) are not addressed later in this Opinion as part of her Equal Protection claims

---

[7] Deng submits that these adverse actions justify application of the "continuing violation" doctrine. Opp'n 1. Under this theory, defendants can be found liable for all of their adverse acts so long as at least one falls within the statutory period of three years. *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994). The Court rejects Deng's characterization. To be sure, courts within this Circuit have not always used clear language in describing the doctrine. Judge Posner offers the following helpful illustration:

> The office of the misnamed doctrine is to allow suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought. It is thus a doctrine not about a continuing, but about a

falling under captions like "Failure to Promote" and "FMLA Retaliation," *infra*. The plaintiff avers that three NODs and a counseling memorandum placed in her personal file were explicitly relied upon by OMH in the arbitration that ended in her termination. *See Bowles v. N.Y.C. Transit Auth.*, No. 03 Civ.3073, 2004 WL 548021, at *2-*3 (S.D.N.Y. Mar. 18, 2004) (finding adverse action where plaintiff's grievance was denied, resulting in "continued unemployment [and] loss of wages," based on a NOD or counseling memo); *compare Weeks v. N.Y. State Div. of Parole,* 273 F.3d 76, 86 (2d Cir. 2001) (NOD and counseling memo were not adverse where plaintiff failed to show how they materially impacted working conditions).

Deng also alleges being denied access to OMH servers from July 29, 2010 to November 19, 2010. During this period, "OMH made no attempt to resolve Deng's complaints and kept Deng … from access[ing the] OMH system." Am. Compl. ¶ 44. The plaintiff explains that this meant losing access "to OMH major Oracle databases, most system shared drives, Novell, and Deng's own personal folders. Deng's own personal folders contain the files that were used in connection with Deng's on-going work at OMH." Finally, the plaintiff indicates that her exclusion from EBSIS staff meetings since filing her EEOC charge on November 11, 2010 meant that "she was not privy to any information required to do her job." Deng's descriptions of

---

cumulative, violation. A typical case is workplace harassment on grounds of sex. The first instance of a coworker's offensive words or actions may be too trivial to count as actionable harassment, but if they continue they may eventually reach that level and then the entire series is actionable.

*Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008) (citations omitted). By contrast, "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify, and are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Instead, [e]ach discrete discriminatory act starts a new clock for filing charges alleging that act, and even serial violations—a series of discrete but related acts of discrimination—do not warrant application of the continuing violations doctrine." *Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011) (internal quotations omitted). For Equal Protection and Title VII purposes, the Court finds that the actionable injuries Deng alleges are discrete acts. She otherwise does not allege non-discrete actions severe or pervasive enough to comprise one independent injury. *See Meckenberg v. N.Y.C. Off-Track Betting*, 42 F. Supp. 2d 359, 372-73 (S.D.N.Y. 1999).

the importance of OMH server access and attendance at EBSIS staff meetings are adequate to overcome the hurdle that she plead actions resulting in a materially adverse change in the conditions of her employment.

**B.    Title VII**

The statute of limitations for Title VII claims is much shorter.  "For a Title VII claim arising in New York to be timely, a plaintiff must file the charge with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the allegedly unlawful employment practice." *Baroor v. N.Y.C. Dep't of Educ.*, 362 F. App'x 157, 159 (2d Cir. 2010).  However, "[a] district court [also] has jurisdiction to hear Title VII claims that … are based on conduct subsequent to the EEOC charge which is reasonably related to that alleged in the EEOC charge." *Butts v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993) (internal quotations omitted).  "The reasonably related rule has been broadly construed to allow judicial redress for most retaliatory acts arising subsequent to an EEOC filing; at the same time we have cautioned that this standard is not to be read as granting an open season for litigating any sort of discrimination claim against the employer." *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1209 (2d Cir. 1993).  The Court construes this *pro se* plaintiff's "continuing violation" argument with respect to Title VII to argue that the "reasonably related" rule should apply to her allegations of retaliation to the filing of her EEOC charge, and the Court agrees.

Accordingly, the window for Deng's Title VII claims stretches from 300 days prior to the filing of her EEOC charge, or January 15, 2010, to December 5, 2011, which is the last allegation of retaliation to her filing. Am. Compl. ¶ 83.  The Amended Complaint indicates that only one NOD, dated October 4, 2010, was filed within this period. *Id.* ¶ 50.  While it is unclear which counseling memo was cited by OMH during Deng's disciplinary arbitration, the Court allows this claim to proceed as well to the extent it is the same memo Finnerty presented to Deng

on August 23, 2011. *Id.* ¶ 65. Additionally, OMH may ultimately be found liable for denying

Deng access to the OMH servers from July 29, 2010 to November 19, 2010 and for preventing

Deng from attending Bureau staff meetings after November 11, 2010.

## VI.    *Failure to Promote*

Plaintiff claims a violation of her Equal Protection and Title VII rights by Finnerty and

Heath, and through them OMH, for failing to promote her to the position of Research Scientist V

over Leckman, who was less qualified. Aside from the fact that Deng's 2008 oral request for the

position falls outside the statute of limitations for Section 1983 and Title VII, Deng's failure to

promote claims are dismissed because she never formally applied for the promotion. *See Brown*

*v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998) ("We read *McDonnell Douglas* and

*Burdine* generally to require a plaintiff to allege that she or he applied for a specific position or

positions and was rejected therefrom, rather than merely asserting that on several occasions she

or he generally requested promotion.").

## VII.    *Hostile Work Environment*

Deng alleges violations of her Equal Protection and Title VII rights by Finnerty,

Leckman, Heath, and through them, OMH, on the theory that they created a racially hostile work

environment. These claims are dismissed as well. As with disparate treatment claims, the

analysis under Section 1983 and Title VII is similar. *Zegarelli*, 451 F.3d at 149. To prevail, a

plaintiff must demonstrate that "the workplace is permeated with discriminatory intimidation,

ridicule, and insult[] that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment ...." *Nat'l R.R. Passenger Corp. v.*

*Morgan*, 536 U.S. 101, 116 (2002) (internal quotations omitted). A court must assess "all the

circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotations omitted).  As Judge Scheindlin noted in *Costello*:

> The Supreme Court distinguishes discrete acts from acts contributing to a hostile work environment on the ground that creation of a hostile work environment involves repeated conduct such that the unlawful employment practice ... cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.

783 F. Supp. 2d at 674 (internal quotations omitted) (brackets omitted).

As mentioned briefly *supra* note 7, considering all of the circumstances, the constellation of non-discrete acts alleged in the amended complaint is not severe or pervasive enough to give rise to a claim of hostile work environment.  In particular, frequent emails and telephone calls from Leckman instructing Deng to perform such basic tasks as meet with her, respond to her emails, answer her phone calls, and post her work are not severe, let alone facially inappropriate from a supervisor.  Notably, the plaintiff fails to allege that Leckman had no basis for repeating these requests.  Likewise, the handful of "surprise" visits made by Leckman and Finnerty were not out-of-bounds.  As Leckman explained to Deng, she was not entitled to pre-notification of a visit from her superior.  *Id.* ¶ 64.

VIII.     ***First Amendment Retaliation***

Deng posits that Finnerty, Leckman, Heath, Forte, Connelly, and Hogan have, either with malice or reckless indifference, infringed upon her First Amendment right to free speech through retaliating against her for filing the EEOC charge, including by terminating her.  The Second Circuit has held that in the public employment context:

> [A] plaintiff making a First Amendment retaliation claim under § 1983 must initially demonstrate by a preponderance of the evidence that: (1) his speech was constitutionally

21

protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination.

*Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999).  It is clear that Deng's complaint to the EEOC is constitutionally protected.  *See Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 125 (2d Cir. 2005) ("[W]e have held repeatedly that when a public employee's speech regards the existence of discrimination in the workplace, such speech is a matter of public concern.").

Moreover, the threshold for what constitutes an adverse employment decision is lower in the First Amendment retaliation context than in the context of disparate treatment claims under Section 1983.  *See Dillon v. Morano*, 497 F.3d 247, 254 (2d Cir. 2007) (clarifying that "the proper legal test in determining whether an employment action is adverse in First Amendment retaliation cases is whether the alleged acts would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights") (internal quotations omitted). Deng states that several adverse employment actions were taken in response to her filing the EEOC charge on November 11, 2010.  *See generally* Am. Compl. ¶¶ 54-84 (acts spanning from on or around November 11, 2010 to December 5, 2011); *see also id.* ¶ 154 (termination on May 17, 2013).  But even if adverse, several of these allegations are not actionable due to their temporal distance from the EEOC charge and the absence of factual allegations to otherwise support an inference of retaliatory animus.  *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) ("The causal connection between the protected activity and the adverse employment action can be established indirectly with circumstantial evidence … or directly through evidence of retaliatory animus.").

Deng's termination on May 17, 2013 is one of several examples of an adverse action that occurred too long after Deng's complaint to the EEOC (two-and-a-half years) for there to be an inference based on proximity.  Although the Second Circuit has not quantified the outer limit of the temporal proximity doctrine, a review of the case law and the factual context at bar establishes that two-and-a-half years is far too remote.  *See, e.g.*, *Morris*, 196 F.3d at 113 (no causality where termination of plaintiff was two years after his letter of support for a fellow plaintiff); *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85-86 (three months too long to suggest a causal link between filing of age discrimination complaint and failure of defendant employer to provide good recommendation to prospective employer).  One illustration of the difficulty in attempting to use a temporal connection to characterize the plaintiff's termination as a response to the EEOC charge is that Deng also purports to make a claim for FMLA retaliation in this action, and she attempted to take sick leave under that statute after the filing of her EEOC charge but prior to her termination.  Deng's conclusory assertion that her termination was in response to the EEOC complaint does not rescue this claim.

What does survive defendants' Motion to Dismiss is the adverse action of being denied access to critical Bureau meetings immediately following Deng's filing with the EEOC.  To the extent Deng alleges her access to the OMH servers was again denied after being restored on November 19, 2010, such that on January 11, 2011 she had to email Leckman and the IT manager to request restoration, this qualifies as adverse as well.

Moreover, because Deng was added to the "Medication Adherence" project in November 2010, shortly after the filing of the EEOC charge, the Court considers and concludes that certain actions taken by Leckman during the plaintiff's tenure on that project would deter a reasonable person from complaining about workplace discrimination.  Specifically, Leckman is said to have

repeatedly ridiculed Deng's work performance while simultaneously declining to provide "any explanation or meaningful input on how to improve the product" and preventing Deng from presenting her work to an expert panel for constructive feedback. She even cancelled a meeting with the panel on the false basis that Deng's work was not ready to be presented. *Id.* Deng suggests that Leckman's stated expectation of one to two deliverables each week was objectively unreasonable in light of the demanding nature of the project. Leckman further alienated Deng by prohibiting her membership in the group email listserv for the first four months of her assignment. Although the deterrent effect of these project-related actions may not be independently cognizable, cumulatively, they comprise an injury. *See Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) ("Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass.").

## IX.      *Wrongful Discharge*

Under this heading, Deng sues OMH, Finnerty, Leckman, Heath, Forte, and Connelly for wrongful termination in response to her EEOC charge. Specifically, she alleges violation of Title VII's prohibition against retaliation[8] and infringement of her 14th Amendment right to Due Process.[9] As previously discussed in the context of her First Amendment retaliation claim, *supra*, Deng's Title VII retaliation claim fails because the period of time between Deng's filing of the charge and her termination forecloses any temporal inference of causality. *See Andersen v. Rochester City Sch. Dist.*, 481 F. App'x 628, 631 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 836 (2013) (Title VII retaliation claims require "a causal connection between the protected activity

---

[8] "It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A. § 2000e-3(a) (West).

[9] The Fifth Amendment to the federal Constitution states: "No state shall … deprive any person of life, liberty, or property, without due process of law …." U.S. Const. amend. XIV.

and the adverse action"). Without direct evidence of retaliatory intent in the alternative, her theory is untenable.

Deng also makes the procedural Due Process argument that she had a property interest in her continued employment, which she was "arbitrarily deprived of … without the due process of law afford[ed] to her side." Am. Compl. ¶ 4. This Section 1983 claim is dismissed as well. "When a person has a property interest that is terminated, procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards." *DeMasi v. Benefico*, 567 F. Supp. 2d 449, 454 (S.D.N.Y. 2008) (internal quotations omitted). Certainly, Deng had a property interest in her continued employment at OMH. *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002) ("A public employee has a property interest in continued employment if the employee is guaranteed continued employment absent just cause for discharge.") (internal quotations omitted).

However, as the defendants note, here the pre-termination arbitration proceeding was adequate due to the notice of the charges given to Deng in the form of the NODs and counseling memoranda she received, as well as the opportunity to be heard at the hearing, Opp'n 22. *See Sweeney v. City of N.Y.*, 186 F. App'x 84, 86 (2d Cir. 2006) ("Procedural due process is satisfied if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing is provided afterwards.") (brackets omitted). And the state provided adequate post-deprivation recourse in the form of Article 75 and Article 78 proceedings. *Locurto v. Safir*, 264 F.3d 154, 175 (2d Cir. 2001) ("An Article 78 proceeding therefore constitutes a wholly adequate post-deprivation hearing for due process purposes.");

*Williams v. City of N.Y.*, No. 12 Civ. 8518, 2014 WL 1383661, at *9 (S.D.N.Y. Mar. 26, 2014) (upholding the sufficiency of Article 75 and Article 78 proceedings).

**X.      *Malicious Prosecution***

Deng theorizes that Forte, Heath, and Finnerty are liable for malicious prosecution under the Due Process Clause for suspending her without probable cause and without pay for over seven months prior to the final, binding arbitration decision to terminate her.  Deng fails to state a claim because the Second Circuit has held that malicious prosecution is cognizable only under the Fourth Amendment.  *Washington v. Cnty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) ("to sustain a § 1983 malicious prosecution claim, there must be a seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment") (internal quotations omitted).

**XI.     *Retaliatory Refusal to Transfer***

Deng submits that Heath, Finnerty, Leckman, Forte, Connelly, and Hogan, either through malice or reckless indifference, violated Title VII, as well as deprived her of her substantive and procedural Due Process rights, when they refused—in retaliation to her filing the EEOC charge—to "remove her from an unbearable working environment."  Am. Compl. ¶ 4.  These claims are dismissed.  The first time Deng asked for a transfer since filing her EEOC charge on November 11, 2010 occurred one-and-a-half years later, when Deng reached out to Hogan on April 20, 2012.  With respect to the Title VII claim, for reasons already stated in the First Amendment retaliation context, *supra*, that length of time precludes any inference of causation, and the Amended Complaint pleads no direct evidence of retaliatory animus to otherwise salvage this claim.

26

Deng states that her substantive Due Process right of "freedom from torture" and her right to procedural Due Process were infringed. The Court generously construes Deng's Section 1983 claims as not hinging on the existence of retaliatory intent. That said, as a matter of common sense, plaintiff's work conditions do not approximate torture under the federal Constitution. She admits that she could have resigned at any point in time, but chose to remain at OMH. *See, e.g., id.* ¶¶ 21, 31, 39, 98. Deng does not elaborate on her vision of the procedural Due Process to which she was entitled based on her request to transfer departments within OMH. She does not allege any deficiencies in the administrative processes available to her, whether leading up to the denials of her requests or following those denials. Without more, Deng does not state a claim.

**XII.**      *FMLA Retaliation*

Under this theme, Deng sues Finnerty, Leckman, Forte, Connelly, and Heath under the FMLA[10], Equal Protection Clause, and Due Process Clause for terminating her and reducing her wages in response to her invocation of the right to take sick leave under the statute.

**A.**      **FMLA**

A *prima facie* case of FMLA retaliation requires a showing by the plaintiff that: "1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza v. City of N.Y.*, 365 F.3d 165, 168 (2d Cir. 2004). At the pleading stage, however, Deng is not required to make a *prima*

---

[10] Deng cites 29 U.S.C. § 2615(a)(2), which states: "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C.A. § 2615(a)(2) (West). In light of her factual allegations, the Court construes the Amended Complaint to refer to 29 U.S.C. § 2615(a)(1), which provides: "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C.A. § 2615(a)(1) (West).

*facie* showing. *Smith v. Westchester Cnty.*, 769 F. Supp. 2d 448, 469 (S.D.N.Y. 2011). Her

burden is merely to plead enough facts to make her claim plausible. *Id.*

  The plaintiff partially succeeds in this effort. It is well-established that termination and

wage deduction are adverse employment actions. *Smith*, 769 F. Supp. 2d at 470-71 ("Traditional

adverse employment actions include materially adverse change[s] in the terms and conditions of

employment, such as termination of employment, a demotion evidenced by a decrease in wage or

salary, … a material loss of benefits, … [and] reduction in pay ….") (internal quotations

omitted). But Deng's theory with respect to her termination fails because the factual allegations

do not give rise to the inference that she was discharged in response to attempting to take leave.

*See Smith*, 769 F. Supp. 2d at 472 ("Plaintiff must demonstrate that his use of FMLA leave, or

his protest of an unlawful FMLA practice, constituted a negative factor in [Defendants'] decision

to take an adverse employment action against him.") (internal quotations omitted). Deng's

termination on May 17, 2013 occurred approximately one-and-a-half years after she first took

FMLA leave on or around December 18, 2011, and more than a year after she returned from

leave on March 23, 2012. As discussed in the Court's analysis of Deng's First Amendment

retaliation claim, *supra*, the temporal distance between the protected activity and the alleged

adverse action is too remote to allow the necessary inference. *See Donnelly v. Greenburgh Cent.*

*Sch. Dist. No. 7*, 691 F.3d 134, 152 (2d Cir. 2012) (applying the temporal proximity doctrine in

the FMLA retaliation context). Deng provides no direct evidence of this otherwise missing link

to maintain her claim.

  By contrast, there is a basis to infer from the pleadings that Deng was not paid for the

sick leave she took in retaliation for trying to take FMLA leave. The decision to not pay her for

the leave she took was necessarily a response to her invocation of the FMLA. Accordingly, this

claim survives.  In holding that this FMLA retaliation claim survives against Finnerty, Leckman,

Forte, Connelly, and Heath, this Opinion joins the handful of courts within the Second Circuit

that have decided the question of whether supervisors at public agencies may be held liable in

their individual capacities for violating the FMLA.  *See Santiago v. Conn. Dep't of Transp.*, No.

12 Civ. 132, 2012 WL 5398884, at *4 (D. Conn. Nov. 5, 2012) (citing the opinions of other

circuit courts and joining the "at least two" district courts within the Second Circuit that have

ruled on the question, deciding in the affirmative).  One of those courts is in this District.  *Smith*,

769 F. Supp. 2d at 473-74.

**B.      Equal Protection Clause**

        Deng's Equal Protection claim that she was singled out in retaliation for attempting to

take sick leave fails because recovery under a class-of-one theory is impermissible.  *Appel v.*

*Spiridon*, 531 F.3d 138, 139 (2d Cir. 2008) ("The Supreme Court recently held that the Equal

Protection Clause does not apply to a public employee asserting a violation of the Clause based

on a class of one theory of liability.") (citing *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 605

(2008)) (internal quotations omitted).

**C.      Due Process Clause**

        Deng argues that the defendants' decision to not compensate her for the leave she took

effected a deprivation of her "property rights."  The Court interprets this as a substantive Due

Process claim.  Deng does not allege that the defendants reduced the amount of sick leave

available to her in any way.  That would appear contrary to the allegation that the sick leave she

attempted to take was subsequently deemed "unauthorized" for procedural reasons.  Rather, the

property interest to which Deng alludes is better defined as an interest in the payments she

ultimately was denied.

And yet not all claims for deprivation of property are cognizable under the 14th Amendment. "Substantive due process protects those rights that are so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Irwin v. City of N.Y.*, 902 F. Supp. 442, 449 (S.D.N.Y. 1995) (internal quotations omitted). The FMLA does not even require employers to compensate employees for their leave. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 84 (2002) ("Qualifying employees are guaranteed 12 weeks of *unpaid* leave each year by the Family and Medical Leave Act of 1993") (emphasis added). Moreover, the Court is not aware of any New York State law entitling Deng to such payments during the relevant period. Presumably, then, Deng's entitlement to compensation relies on a contractual relationship that does not create a property interest for the demanding standard set by the doctrine of substantive Due Process. *See Irwin*, 902 F. Supp. at 450 ("[T]he Second Circuit recently wrote that simple state-law contractual rights, without more, are [not] worthy of substantive due process protection.") (internal quotations omitted).

**XIII.**     ***Illegal Wage Deductions***

Deng also alleges that Finnerty, Leckman, Forte, Connelly, and Heath violated Section 193 of the New York Labor Law, the FLSA, and her substantive Due Process rights when they "impos[ed] a new personal attendance policy" that allowed them to deduct wages from Deng's paycheck. This apparently began with an ostensibly unauthorized doctor's appointment on June 1, 2012, for which Deng had attempted to use her sick leave. Section 193 of the New York Labor Law provides that "[n]o employer shall make any deduction from the wages of an employee," with exceptions. N.Y. Lab. Law § 193(1) (McKinney). It is unclear whether any of those exceptions apply, and defendants have not argued that they are relevant here. *See Opp'n*

28-29. Taking this *pro se* litigant's factual allegations that her wages were arbitrarily reduced as true, her claim lives to see another day.

However, the FLSA claim is dismissed because in the Amended Complaint, Deng neither cites the specific provision under which she sues nor refers to any of the statute's substantive elements.  Furthermore, as mentioned in the discussion of Deng's FMLA retaliation claims, *supra*, Deng's Due Process claim for the wage deductions is dismissed on the basis that state-law contractual rights do not receive substantive Due Process protection.

XIV.       *Stigma-Plus*

Deng sues Heath under the Due Process Clause on a theory of stigma-plus, which does not pass muster.

> In an action based on a termination from government employment, a plaintiff must satisfy three elements in order to demonstrate a deprivation of the stigma component of a stigma-plus claim.  *First*, the plaintiff must ... show that the government made stigmatizing statements about her—statements that call into question the plaintiff's good name, reputation, honor, or integrity.... *Second*, a plaintiff must prove these stigmatizing statements were made public.  *Third*, the plaintiff must show that the stigmatizing statements were made concurrently with, or in close temporal relationship to, the plaintiff's dismissal from government employment.

*Segal v. City of N.Y.*, 459 F.3d 207, 212 (2d Cir. 2006) (citations omitted) (internal quotations omitted) (brackets omitted).

As defendants point out, Deng fails to satisfy the second prong of the test laid out in *Segal* because Heath did not make her so-called defamatory statements public.  Opp'n 22-23.  Rather, the plaintiff alleges that Heath, presumably in response to an email on August 30, 2012 from Deng to Leckman explaining why she would not meet with her, sent an email "to a group of people" that "contained a false fact ... to disgrace and contempt Deng in the public."  Am. Compl. ¶¶ 137-38.  Deng does not allege that the email was circulated outside of OMH.  Internal, work-related communications like the one described are not considered published. *See Brevot v.*

*N.Y.C. Dep't of Educ.*, 299 F. App'x 19, 21 (2d Cir. 2008) (publication requirement not met where "internal document circulated only within the Department"); *Nuttle v. Ponton*, 544 F. Supp. 2d 175, 177 (W.D.N.Y. 2008) (no publication where complaints made by professor about student were not "disseminated … outside of Buffalo State College").  No other grounds for dismissal need be considered.

**XV.**　　　***Intentional Infliction of Emotional Distress***

　　　　Deng posits that Finnerty, Leckman, Heath, Forte, Connelly, and Hogan, either through malice or reckless indifference, through all of their actions, caused the intentional infliction of emotional distress ("IIED") in violation of her right to substantive Due Process, which she defines as "freedom from torture," or in the alternative, her right to procedural Due Process. Deng clearly means to make a common law claim for the intentional infliction of emotional distress, and that is how the Court will construe her efforts.

　　　　Yet even that claim is dismissed because the conduct of the defendants does not meet the high bar of egregiousness set in such cases.

> Under New York law, a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

*Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (citations omitted) (internal quotations omitted).  In New York, the statute of limitations for claims of IIED is one year.  *Overall v. Estate of Klotz*, 52 F.3d 398, 403 (2d Cir. 1995).  Between September 24, 2012 and the filing of the original complaint one year later, Deng alleges that: her computer access was disabled sometime in September 2012, Am. Compl. ¶ 142; she "received a third charge of

insubordination" in that same month, *id.* ¶ 144; she attended an interrogation that resulted in her seven-month suspension without pay beginning on October 3, 2012; and she participated in a three-day arbitration proceeding ending in a finding that her termination was appropriate, but that that there had not been probable cause to suspend her without pay, and ordering the disbursement of salary and benefits withheld from her during that seven-month period. However wrongful Deng may ultimately prove defendants' conduct to be, on the face of the Amended Complaint, there is nothing "extreme and outrageous" about this particular set of actions where Deng had ample notice that a case of insubordination was being built against her and she fails to plead facts suggesting that, contrary to the charges of insubordination, she actually followed the directives of her supervisors.

## XVI.    *Qualified Immunity*

The defendants submit that the Amended Complaint should be dismissed as against the individual defendants on grounds of qualified immunity. The Court declines. "The doctrine of qualified immunity protects state officials from civil liability for actions performed in the course of their duties if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (internal quotations omitted). A right is considered "clearly established" when "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Id.* (internal quotations omitted) (brackets omitted). However, a federal appellate court does not need to hold that a specific action is unlawful in order for a state official to be put on notice of that fact. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Rather, "in the light of pre-existing law the unlawfulness must be apparent." *Id.*

A.      **FMLA**

Defendants' argument with respect to Deng's FMLA retaliation claim fails. They argue that in the public employment context, individual supervisors should not be held liable for violating the statute, and that at the very least, qualified immunity should attach to the individual defendants because it was (and remains, by their logic) unclear whether they as supervisors at public agencies may be found liable in their individual capacities. Reply 9-10.

The fact that the Second Circuit has not ruled on whether supervisors at public agencies may be found individually liable under the FMLA, and that there is a split among the other circuits, *Smith*, 769 F. Supp. 2d at 473, does not make *Deng's right to not be retaliated against* for attempting to take FMLA leave any less clearly established. That is the only right that matters when determining the existence of qualified immunity. *See Darby v. Bratch*, 287 F.3d 673, 680-81 (8th Cir. 2002) (finding FMLA rights clearly established and rejecting the same qualified immunity argument made by defendants on this ground); *Santiago v. Dep't of Transp.*, No. 12 Civ. 132, 2014 WL 4823869, at *16 (D. Conn. Sept. 25, 2014) (joining the reasoning in *Darby* regarding qualified immunity); *Brunson v. Forest Pres. Dist. of Cook Cnty.*, No. 8 C. 2200, 2010 WL 780331, at *8 (N.D. Ill. Mar. 3, 2010) (rejecting the argument made by defendants in the instant matter for the same reason). It is irrelevant whether the defendants could have predicted that they would be found personally liable under the FMLA, so long as the anti-retaliation provision of the statute was clearly established, which cannot seriously be refuted.[11] *See* 29 U.S.C. § 2615(a)(1); *see also Darby*, 287 F.3d at 681 ("The Family and Medical Leave Act creates clearly established statutory rights, including the right to be free of discrimination or retaliation on account of one's exercise of leave rights granted by the statute.").

---

[11] Defendants, wisely, do not suggest that Deng's right to not be retaliated against under 29 U.S.C. § 2615(a)(1) is unclear.

**B.      Section 1983**

The individual defendants also contend that they have qualified immunity with respect to the Section 1983 claims that would otherwise survive their Motion to Dismiss.  Specifically, they claim that they could not have known that the actions they took were adverse.  Opp'n 26.  This is implausible.  Of the few Section 1983 claims that survive, all of them correspond to allegations of adverse actions that are, if not specifically, then by analogy and common sense, clearly established based on the pre-existing law in this Circuit.  Defendants will of course have another opportunity to refute Deng's allegations on summary judgment, once discovery is taken.

## CONCLUSION

For the aforementioned reasons, the defendants' Motion to Dismiss is GRANTED in part and DENIED in part.  Specifically, the aforementioned claims of disparate treatment ("Intentional Racial Discrimination") under the Equal Protection Clause and Title VII, First Amendment retaliation, FMLA retaliation, and illegal wage deduction under Section 193 of the New York Labor Law survive.  All other claims are DISMISSED.


**SO ORDERED.**


Dated:        **New York, New York**
              **January 15, 2015**


_____

**ANDREW L. CARTER, JR.**
**United States District Judge**

35